UNITED STATES COURTS
SOUTHERN DISTRICT OF TEXAS
FILED

JUN 3 0 2005

MICHAEL N. MILBY, CLERK OF COURT

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re DYNEGY, INC. SECURITIES LITIGATION | § § § § | Master File No. H-02-1571 |
| | § | CLASS ACTION |
| This Document Relates To: | § § § | |
| ALL ACTIONS. | § § | |

**LEAD PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF FINAL APPROVAL OF SETTLEMENT AND PLANS OF ALLOCATION OF SETTLEMENT PROCEEDS**

# TABLE OF CONTENTS

**Page**

I.    NATURE AND STAGE OF THE PROCEEDING ................................................................1

II.    SUMMARY OF ARGUMENT ............................................................................................1

III.    ISSUES TO BE RULED UPON BY THE COURT AND THE STANDARD OF REVIEW ....................................................................................................................5

IV.    THE PROPOSED SETTLEMENT SHOULD BE APPROVED AS FAIR, ADEQUATE AND REASONABLE ......................................................................................5

    A.    The Fifth Circuit Favors Settlements and Presumes the Fairness of a Settlement Proposed by Competent and Experienced Counsel ..............................5

    B.    The Fifth Circuit's Six Key Fairness Factors ....................................................8

        1.    The Settlement Is Not the Product of Fraud or Collusion ..........................9

        2.    The Complexity, Expense and Likely Duration of This Litigation ..........10

        3.    The Stage of the Proceedings at Which Settlement Was Achieved and the Amount of Discovery Completed ..................................................12

        4.    The Probability of Success on the Merits ..................................................13

        5.    The Range of Possible Recovery and Difficulty of Proving Damages ..................................................................................................16

            a.    The Risk of Establishing Damages ................................................16

            b.    The Settlement Consisting of $474,050,000 Plus Interest and the Implementation of the Corporate Governance Reform Falls Well Within the Range of Reasonableness ..............18

        6.    The Opinion of Lead Plaintiff's Counsel and Class Members Favor Approval of the Settlement ........................................................................19

V.    THE COURT SHOULD FIND THE SHARE COMPONENT OF THE SETTLEMENT EXEMPT FROM REGISTRATION ......................................................20

VI.    THE PLANS OF ALLOCATION ARE FAIR AND REASONABLE ..............................22

VII.    CONCLUSION ..................................................................................................................23

# TABLE OF AUTHORITIES

**Page**

*Adams v. Amplidyne, Inc.,*
   No. 99-4468(MLC), 2001 U.S. Dist. LEXIS 14464
   (D.N.J. Aug. 15, 2001)........................................................................................21

*Ahearn v. Fibreboard Corp.,*
   162 F.R.D. 505 (E.D. Tex. 1995)........................................................................20

*Ayers v. Thompson,*
   358 F.3d 356 (5th Cir. 2004) .................................................................................5

*Beecher v. Able,*
   575 F.2d 1010 (2d Cir. 1978).............................................................................22

*Berkey Photo, Inc. v. Eastman Kodak Co.,*
   603 F.2d 263 (2d Cir. 1979)...............................................................................11

*Camp v. Progressive Corp.,*
   No. 01-2680, 2004 U.S. Dist. LEXIS 19172
   (E.D. La. Sept. 23, 2004) .......................................................................................6

*Class Plaintiffs v. Seattle,*
   955 F.2d 1268 (9th Cir. 1992) ...........................................................................22

*Cotton v. Hinton,*
   559 F.2d 1326 (5th Cir. 1977) ...............................................................5, 6, 7, 12

*Detroit v. Grinnell Corp.,*
   495 F.2d 448 (2d Cir. 1974)..........................................................................18, 20

*Draney v. Wilson, Morton, Assaf & McElligott,*
   [1985-1986 Transfer Binder],
   Fed. Sec. L. Rep. (CCH) ¶92,359
   (D. Ariz. Sept. 30, 1985).....................................................................................11

*Dura Pharms., Inc. v. Broudo,*
   ___ U.S. ___, 125 S. Ct. 1627 (2005)................................................................17

*Fickinger v. C.I. Planning Corp.,*
   646 F. Supp. 622 (E.D. Pa. 1986) ......................................................................18

*Fisher Bros. v. Cambridge-Lee Indus., Inc.,*
   630 F. Supp. 482 (E.D. Pa. 1985) ......................................................................20

Page

*Fla. Trailer & Equip. Co. v. Deal,*
    284 F.2d 567 (5th Cir. 1960) ........................................................................5

*Hughes Tool Co. v. Trans World Airlines, Inc.,*
    409 U.S. 363, 93 S. Ct. 647 (1973) ...........................................................11

*Ibarra v. Tex. Employment Comm'n,*
    823 F.2d 873 (5th Cir. 1987) ........................................................................5

*In re Cell Pathways, Inc., Sec. Litig.,*
    No. 01-CV-1189, 2002 U.S. Dist. LEXIS 18359
    (E.D. Pa. Sept. 24, 2002) ...........................................................................21

*In re Chicken Antitrust Litig. Am. Poultry,*
    669 F.2d 228 (5th Cir. 1982) ...................................................................5, 22

*In re Corrugated Container Antitrust Litig.,*
    643 F.2d 195 (5th Cir. 1981) ......................................................................12

*In re Global Crossing Sec. & ERISA Litig.,*
    225 F.R.D. 436 (S.D.N.Y. 2004) ...............................................................23

*In re Gulf Oil/Cities Serv. Tender Offer Litig.,*
    142 F.R.D. 588 (S.D.N.Y. 1992) ...............................................................22

*In re Ikon Office Solutions, Inc.,*
    194 F.R.D. 166 (E.D. Pa. 2000) .................................................................22

*In re Letterman Bros. Energy Sec. Litig.,*
    799 F.2d 967 (5th Cir. 1986) ......................................................................17

*In re Nucorp Energy Sec. Litig.,*
    661 F. Supp. 1403 (S.D. Cal. 1987) ...........................................................11

*Karasik v. Pacific Eastern Corp.,*
    180 A. 604 (Del. Ch. 1935) ...................................................................18, 19

*Lelsz v. Kavanagh,*
    783 F. Supp. 286 (N.D. Tex. 1991),
    *aff'd,* 983 F.2d 1061 (5th Cir. 1993) ........................................................7, 19

*Maher v. Zapata Corp.,*
    714 F.2d 436 (5th Cir. 1983) .................................................................5, 6, 20

**Page**

*Manchaca v. Chater,*
   927 F. Supp. 962 (E.D. Tex. 1996) ................................................................12

*McNary v. Am. Sav. & Loan Ass'n,*
   76 F.R.D. 644 (N.D. Tex. 1977) ...............................................................8, 18

*Meyer v. Citizens & S. Nat'l Bank,*
   677 F. Supp. 1196 (M.D. Ga. 1988) ............................................................11

*Miller v. Republic Nat'l Life Ins. Co.,*
   559 F.2d 426 (5th Cir. 1977) .........................................................................5

*Neff v. Via Metro. Transit Auth.,*
   179 F.R.D. 185 (W.D. Tex. 1998) .................................................................9

*Newby v. Enron Corp.,*
   394 F.3d 296 (5th Cir. 2004) ......................................................................12

*Newman v. Stein,*
   464 F.2d 689 (2d Cir. 1972) .......................................................................18

*Parker v. Anderson,*
   667 F.2d 1204 (5th Cir. 1982) ............................................................5, 9, 18

*Pearson v. Ecological Sci. Corp.,*
   522 F.2d 171 (5th Cir. 1975) .........................................................................5

*Pettway v. Am. Cast Iron Pipe Co.,*
   576 F.2d 1157 (5th Cir. 1978) .......................................................................7

*Piper v. Chris-Craft Indus.,*
   430 U.S. 1, 97 S. Ct. 926 (1977) ................................................................11

*Purdie v. Ace Cash Express, Inc.,*
   No. 3:01-CV-1754-L, 2003 U.S. Dist. LEXIS 22547
   (N.D. Tex. Dec. 11, 2003) ............................................................................6

*Reed v. GMC,*
   703 F.2d 170 (5th Cir. 1983) .................................................................5, 7, 9

*Robbins v. Koger Props.,*
   116 F.3d 1441 (11th Cir. 1997) ..................................................................11

**Page**

*Rubenstein v. Republic Nat'l Life Ins. Co.*,
    74 F.R.D. 337 (N.D. Tex. 1976) ..................................................................8

*Ruiz v. McKaskle*,
    724 F.2d 1149 (5th Cir. 1984) ...................................................................5

*SEC v. Navin*,
    166 F.R.D. 435 (N.D. Cal. 1995),
    *aff'd*, 1996 U.S. App. LEXIS 25424
    (9th Cir. Sept. 25, 1996)..........................................................................21

*Salinas v. Roadway Express, Inc.*,
    802 F.2d 787 (5th Cir. 1986) ...................................................................9

*San Antonio Hispanic Police Officers' Org., Inc. v. City of San Antonio*,
    188 F.R.D. 433 (W.D. Tex. 1999) ...........................................................9

*Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*,
    365 F.3d 353 (5th Cir. 2004) .................................................................13

*United States v. Tex. Educ. Agency*,
    679 F.2d 1104 (5th Cir. 1982) .................................................................7

*West Virginia v. Chas. Pfizer & Co.*,
    314 F. Supp. 710 (S.D.N.Y. 1970),
    *aff'd*, 440 F.2d 1079 (2d Cir. 1971)......................................................19

*White v. NFL*,
    822 F. Supp. 1389 (D. Minn. 1993)........................................................22

*Williams v. First Nat'l Bank*,
    216 U.S. 582, 30 S. Ct. 441 (1910)..........................................................5

*Young v. Katz*,
    447 F.2d 431 (5th Cir. 1971) ...................................................................6

*Zerkle v. Cleveland-Cliffs Iron Co.*,
    52 F.R.D. 151 (S.D.N.Y. 1971) .............................................................18

Page

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
      §77c ...................................................................................................................21
      §77k.........................................................................................................13, 15, 16
      §78j(b)........................................................................................................13, 17

Federal Rules of Civil Procedure
      Rule 23 ...............................................................................................................22
      Rule 23(e).................................................................................................1, 21, 22

Federal Rules of Evidence
      Rule 804(b)(1).....................................................................................................15

17 C.F.R.
      §240.10b-5 .........................................................................................................22

**SECONDARY AUTHORITY**

*Manual for Complex Litigation* (2d ed. 1985)
      §30.41..................................................................................................................7

## I.  NATURE AND STAGE OF THE PROCEEDING

Lead Plaintiff, The Regents of the University of California ("The Regents"), submits this memorandum of law pursuant to Rule 23(e) of the Federal Rules of Civil Procedure in support of the proposed settlement (the "Settlement")[1] of the above-captioned consolidated class action (the "Litigation").  After three years of hard-fought litigation, Lead Counsel have achieved an outstanding result for the Class which merits the approval of the Court – a recovery of $474,050,000 (the "Settlement Amount")[2] plus the involvement of The Regents in a process by which two directors of Dynegy, Inc. ("Dynegy" or the "Company") will be selected.[3]  The Settlement is on behalf of a class of all persons who purchased the publicly traded securities of Dynegy between June 21, 2001 and July 22, 2002, inclusive, or who purchased Dynegy 6.875% Notes offered in March 2001 (the "Class" and the "Class Period").[4]

## II.  SUMMARY OF ARGUMENT

This Settlement far exceeds the legal standards for fairness to the Class and (in many respects) is unprecedented in magnitude.  The gross amount of the Settlement Amount ranks eighth

---

[1]  The specific terms and conditions of the Settlement are contained in the Stipulations of Settlement dated as of March 10, and May 2, 2005 (the "Stipulations"), the originals of which have been filed with the Clerk of the Court.

[2]  The Settlement Amount consists of the following components: $150,000,000 from Dynegy's insurance carriers; $250,000,000 in cash from Dynegy; $5,000,000 in cash from Citigroup; $1,050,000 in cash from Arthur Andersen LLP; and 17,578,781 shares of Dynegy common stock worth $68,000,000.

[3]  All capitalized terms not defined herein shall have the same meanings as set forth in the Stipulations.

[4]  A more detailed description of the prosecution of this Litigation and the factors bearing on the reasonableness of the Settlement and Plans of Allocation is set forth in the Declaration of G. Paul Howes in Support of Final Approval of Class Action Settlement, Plans of Allocation and Application of Lead Counsel for an Award of Attorneys' Fees and Reimbursement of Expenses ("Howes Declaration), submitted herewith.

in recoveries anywhere in securities class actions since the passage of the PSLRA. It is the second largest securities class action result ever obtained in this District, exceeded only by the partial settlements that have been announced in connection with the Enron litigation. The average amount per share anticipated to be distributed to Class members who file valid proof of claim forms compares very favorably (about 38%) of the damages per share calculated by our damage expert and vastly exceeds the amount set forth in Defendants' damage expert report.

The Settlement, one of the largest ever in the Fifth Circuit, consists of two components. First, the Settlement Amount of $474,050,000 in cash and stock, portions of which have been deposited into an escrow account and are earning interest for the benefit of the Class.[5] Obtaining such a large recovery is a testament to the exhaustive, creative and diligent efforts of Lead Counsel and the leadership and direction of the Lead Plaintiff. The other component of the Settlement is the involvement of The Regents in the process to identify qualified candidates to be selected in place of two of the Dynegy director defendants. The significance of this provision is discussed by a highly-regarded expert in the field of corporate governance, Robert A.G. Monks. *See* Declaration of Robert A.G. Monks, submitted herewith. This reform (as well as those instituted in connection with the settlement of the related derivative action in state court) were received well by the market. In the months after the announcement of the Settlement in mid-April 2005, Dynegy's market capitalization increased some 37%.

As detailed in the Howes Declaration, this complex securities class action was carefully investigated and vigorously litigated since its commencement. The Settlement was achieved only after three years of litigation involving, among other things, Lead Plaintiff's extensive on-going investigation, including review and analysis of both publicly and privately available information

---

[5]     The balance will be deposited after final approval.

about the Company, extensive witness interviews, production and analysis of over 1.2 million pages of documents, analysis of a number of Dynegy transactions and accounting practices, 19 fact depositions, expert and consultant retention and the exchange of expert reports regarding accounting and damages, extensive briefing on Defendants' motions to dismiss, on class certification and on summary judgment, and protracted arm's-length settlement negotiations among the parties. The Settlement was not achieved until pretrial proceedings were virtually complete and with the assistance of a highly respected, neutral mediator the Honorable Daniel Weinstein (Ret.) shortly before trial was scheduled to begin.

Counsel for the Lead Plaintiff, who are well-respected and experienced in prosecuting securities class actions, have concluded that this Settlement, consisting of a huge cash and stock component plus meaningful corporate governance changes, is an outstanding result and in the best interests of the Class. This conclusion is based on, among other things, the substantial risks and expense in continuing this Litigation through trial and probable appeal, especially given the large percentage of cases where dismissals with prejudice are affirmed by the Fifth Circuit on motions to dismiss and the risks attendant on proving scienter and substantial damage.[6] Moreover, this was not a case where liability and damages were in any way conceded. As set forth at length in the Howes Declaration, despite the evidence from the *Olis* criminal trial, proving the **Company's** scienter at trial was no sure thing. Defendants also had a very credible loss causation argument and could (and did) point to the general malaise in the energy industry to bolster their argument that losses in Dynegy securities were caused by that and not any actionable wrongdoing. Given the distinct possibility that a large judgment could bankrupt the Company, and upon analysis of the evidence, past experience in

---

[6] The Fifth Circuit has affirmed in full dismissals in 9 of the 12 Private Securities Litigation Reform Act of 1995 ("PSLRA") cases before it, including one involving WorldCom.

litigating complex actions similar to the present action, and the serious risks concerning the ability to establish liability and the amount of damages suffered by the Class, Lead Plaintiff's counsel believe that this Settlement deserves the Court's approval.

Therefore, it is respectfully submitted that the Settlement is fair, reasonable and adequate to the Class and should be approved by this Court. Moreover, the Plans of Allocation of settlement proceeds, which were provided to the Class in the Notices of Pendency and Settlement of Class Action ("Notices") and track the theory of damages asserted by Lead Plaintiff (with due consideration for ease and efficiency in claims administration), are also fair, reasonable and adequate, and likewise deserve the Court's approval.

Confirming the fairness and reasonableness of the Settlement and the Plans of Allocation is the overwhelming favorable reaction of the Members of the Class. Pursuant to Orders of this Court dated May 11, 2005, copies of the Notices were mailed to over 80,000 Members of the Class, and summary notices were published in *Investor's Business Daily* on March 31, and May 25, 2005.[7] To date, Lead Plaintiff's counsel have received no objections to the proposed Settlement and/or Plans of Allocation, and the time for serving and filing any such objections expired on June 20, 2005.

---

[7] *See* ¶¶3-6, 8, 15-18, 20 to the Declaration of Carole K. Sylvester Re A) Mailing of the Notice of Proposed Settlement of Class Action with Arthur Andersen LLP, and of Settlement Fairness Hearing and the Proof of Claim and Release Form; B) Publication of the Summary Notice; C) Mailing of the Notice of Adjournment of Settlement Fairness Hearing Date for Settlement with Arthur Andersen LLP; D) Mailing of the Notice of Rescheduled Fairness Hearing Date Regarding Settlement of Class Action with Arthur Andersen LLP; E) Notice of Pendency and Settlement of Class Action, Hearing on Proposed Settlement and Attorneys' Fee Petition and Right to Share in Settlement Fund and the Proof of Claim and Release Form; and F) Publication of Summary Notice ("Sylvester Decl."), submitted herewith.

### III. ISSUES TO BE RULED UPON BY THE COURT AND THE STANDARD OF REVIEW

By this motion, Lead Plaintiff requests the Court determine (among other things) whether the proposed settlement is "fair, adequate and reasonable" and has been entered into without collusion between the parties. *Ayers v. Thompson*, 358 F.3d 356, 368 (5th Cir. 2004); *Ruiz v. McKaskle*, 724 F.2d 1149, 1152 (5th Cir. 1984); *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977). *See also Ibarra v. Tex. Employment Comm'n*, 823 F.2d 873, 878 (5th Cir. 1987); *Maher v. Zapata Corp.*, 714 F.2d 436, 454 (5th Cir. 1983); *Parker v. Anderson*, 667 F.2d 1204, 1209 (5th Cir. 1982). In applying this standard, the court must determine whether, in light of the claims and defenses asserted by the parties, the proposed compromise represents a "reasonable evaluation of the risks of litigation." *Fla. Trailer & Equip. Co. v. Deal*, 284 F.2d 567, 571 (5th Cir. 1960). This Court's determination of whether the proposed settlement should be approved may not be overturned on review unless there is an "abuse of discretion." *Reed v. GMC*, 703 F.2d 170, 172 (5th Cir. 1983).

Lead Plaintiff also requests the Court approve the Plans of Allocation of settlement proceeds as fair, reasonable and adequate. Assessment of a plan of allocation of settlement proceeds in this case is governed by the same standards of review applicable to the settlement as a whole. *In re Chicken Antitrust Litig. Am. Poultry*, 669 F.2d 228, 238 (5th Cir. 1982).

### IV. THE PROPOSED SETTLEMENT SHOULD BE APPROVED AS FAIR, ADEQUATE AND REASONABLE

#### A. The Fifth Circuit Favors Settlements and Presumes the Fairness of a Settlement Proposed by Competent and Experienced Counsel

It has long been settled that compromises of disputed claims are favored by the courts. *Williams v. First Nat'l Bank*, 216 U.S. 582, 595, 30 S. Ct. 441 (1910). The Fifth Circuit has repeatedly held that, as a result of their highly-favored status, settlements "'will be upheld whenever possible because they are a means of amicably resolving doubts and preventing lawsuits.'" *Miller v. Republic Nat'l Life Ins. Co.*, 559 F.2d 426, 428 (5th Cir. 1977) (quoting *Pearson v. Ecological Sci.*

- 5 -

*Corp.*, 522 F.2d 171, 176 (5th Cir. 1975)). Settlements are compromises, "'a yielding of the highest

hopes in exchange for certainty and resolution.'" *Camp v. Progressive Corp.*, No. 01-2680, 2004

U.S. Dist. LEXIS 19172, at *18 (E.D. La. Sept. 23, 2004) (citation omitted) (Compendium, Ex. 3).[8]

Settlements of class actions and shareholder litigation are "particularly favored" and are not

to be lightly rejected by the courts. *Maher*, 714 F.2d at 455. *See also Cotton*, 559 F.2d at 1331. In

the context of class actions, the Fifth Circuit has held that "there is an overriding public interest in

favor of settlement" because such suits "have a well deserved reputation as being most complex."

*Id.*; *Purdie v. Ace Cash Express, Inc.*, No. 3:01-CV-1754-L, 2003 U.S. Dist. LEXIS 22547, at *16

(N.D. Tex. Dec. 11, 2003) (citing *Cotton*) (Compendium, Ex. 14). Thus, in determining whether to

approve a settlement, courts are not required to decide the merits of the action or substitute their own

judgment for that of the parties or that of counsel. *See Maher*, 714 F.2d at 455.

In weighing the benefits obtained by the agreement of settlement against the benefits

dependent on the likelihood of recovery upon the plaintiffs' causes of action, courts cannot be

expected to balance the scales perfectly. The trial court should not make a proponent of a proposed

settlement "'justify each term of settlement against a hypothetical or speculative measure of what

concessions might have been gained; inherent in compromise is a yielding of absolutes and an

abandoning of highest hopes.'" *Cotton*, 559 F.2d at 1330 (citation omitted). The very object of a

compromise "'"is to avoid the determination of sharply contested and dubious issues."'" *Young v.

Katz*, 447 F.2d 431, 433 (5th Cir. 1971) (citations omitted).

---

[8]     A copy of this decision as well as other unreported and unofficially reported decisions cited herein are contained in the Compendium of Unreported Authorities Cited in Support of Final Approval of Settlement and Plan of Allocation of Settlement Proceeds and Application for an Award of Attorneys' Fees and Reimbursement of Expenses ("Compendium"), submitted herewith.

Courts in this Circuit have recognized that "'a presumption of correctness is said to attach to a class settlement reached in arms length negotiations between experienced, capable counsel after meaningful discovery.'" *Lelsz v. Kavanagh*, 783 F. Supp. 286, 297 (N.D. Tex. 1991) (quoting *Manual for Complex Litigation* §30.41 (2d ed. 1985)), *aff'd*, 983 F.2d 1061 (5th Cir. 1993). *See also United States v. Tex. Educ. Agency*, 679 F.2d 1104, 1108 (5th Cir. 1982); *Cotton*, 559 F.2d at 1330. Moreover, the Fifth Circuit has also acknowledged that courts must rely to a large degree on the judgment of competent counsel, terming such counsel the "linchpin" of an adequate settlement. *Reed*, 703 F.2d at 175. Thus, if experienced counsel determine that a settlement is in the class's best interests, "the attorney's views must be accorded great weight." *Pettway v. Am. Cast Iron Pipe Co.*, 576 F.2d 1157, 1216 (5th Cir. 1978).

When examined under the applicable criteria, it is evident that this Settlement is an exceptional recovery for the Class. It is Lead Counsel's judgment that there is a serious question as to whether a more favorable result against the Defendants could or would be attained through further litigation, trial, and the inevitable post-trial motions and appeals. The proposed Settlement, which achieves an immediate and substantial recovery for the Class Members, is superior to another possibility which unmistakably would have existed if the Litigation continued: no recovery at all. Therefore, this Settlement unquestionably warrants this Court's approval.

During the course of this Litigation, Lead Plaintiff's counsel have made a thorough and detailed investigation into the facts and applicable legal principles. More than one million two hundred thousand images have been reviewed and analyzed, countless witnesses were located and interviewed, experts and consultants were retained and their reports prepared and exchanged, nineteen fact witnesses were deposed and preparation for trial was otherwise virtually complete. *See* Howes Declaration, ¶3. Moreover, in Defendants' motions to dismiss, in their opposition to class certification and during the mediation sessions and numerous telephone conversations discussing

- 7 -

settlement, Defendants' positions and defenses were well articulated. As a result of these efforts and circumstances, Lead Plaintiff's counsel have a firm understanding of the strengths and weaknesses of the case. Given the substantial additional effort, expense, delays and uncertainties necessary to conduct a trial on the merits and handle the inevitable post-trial motions and appeals, along with the substantial risk, given Defendants' strongly asserted views regarding liability and damages, that Lead Plaintiff and the Class would receive little or nothing, Lead Plaintiff's counsel submit that the proposed Settlement is in the best interest of the Class and should be approved by the Court.

**B.     The Fifth Circuit's Six Key Fairness Factors**

Once a court is satisfied that counsel adequately represented the class and bargained in good faith for the proposed settlement, the "only question" remaining for the court to determine in evaluating a proposed settlement """is whether the settlement, taken as a whole, is so unfair on its face as to preclude judicial approval.""" *McNary v. Am. Sav. & Loan Ass'n*, 76 F.R.D. 644, 649 (N.D. Tex. 1977) (citations omitted); *Rubenstein v. Republic Nat'l Life Ins. Co.*, 74 F.R.D. 337, 347 (N.D. Tex. 1976). To assist the District Court in reaching this determination, the Fifth Circuit has established the following six-prong objective test to be applied to the proposed Settlement by the Court:

1.     whether the settlement was a product of fraud or collusion;

2.     the complexity, expense, and likely duration of the litigation;

3.     the stage of proceedings and the amount of discovery completed;

4.     the probability of plaintiffs' success on the merits;

5.     the range of possible recovery and the certainty of damages; and

6.     the opinions of the participants, including class counsel, class representatives, and the absent class members.

*See Reed*, 703 F.2d at 172; *Parker*, 667 F.2d at 1209; *Salinas v. Roadway Express, Inc.*, 802 F.2d 787, 789 (5th Cir. 1986). This Settlement easily passes muster when examined in light of these six criteria.

### 1. The Settlement Is Not the Product of Fraud or Collusion

There is absolutely no hint of collusion in this Settlement. In fact, this Litigation was hotly contested, hard-fought and mediated in multiple sessions by a highly-experienced mediator, the Honorable Daniel Weinstein. The parties conducted extensive arm's-length negotiations both before and after signing the Memorandum of Understanding in April 2005. Further negotiations regarding the terms of the Stipulation and its exhibits were similarly hard-fought, and took place at arm's length at all times.

Lead Counsel negotiated the Settlement fully informed about the strengths and weaknesses of the claims and defenses that Defendants would (and did) assert. Initially, settlement discussions did not result in an agreement. During the settlement negotiations, counsel for Lead Plaintiff and Defendants made detailed presentations which set forth their positions on the respective strengths of their clients' positions on liability as well as damages and, importantly, Dynegy's ability to pay. Each side zealously advanced their respective positions. It took dozens of telephone conversations and face-to-face meetings before the parties were able to reach an agreement-in-principle to settle the Litigation. The agreement-in-principle was followed by extensive negotiation regarding the terms of the Settlement, the scope of releases and the establishment of opt-out thresholds. *See, e.g., San Antonio Hispanic Police Officers' Org., Inc. v. City of San Antonio*, 188 F.R.D. 433, 458 (W.D. Tex. 1999) (finding that there was no evidence of collusion, but rather, that "the settlement was the result of hard fought, arm's length negotiations"); *Neff v. Via Metro. Transit Auth.*, 179 F.R.D. 185, 209 (W.D. Tex. 1998) (same). Therefore, it is beyond question that the Settlement was negotiated in good faith.

2. **The Complexity, Expense and Likely Duration of This Litigation**

This Litigation is a complex securities class action replete with difficult issues of proof in establishing liability and in proving damages. The existence of the following factors make it more likely that, without the Settlement, the case would require an additional expenditure of time and money in a trial and inevitable appeals, made all the more risky by the limited amount of time assigned for trial, all leading to the significant risk that the Class would obtain a result far less beneficial than the one provided by the Settlement:

(a) Defendants are represented by extremely capable counsel who are familiar with the defense of complex securities class actions such as this Litigation. Since the inception of the Litigation, Defendants have adamantly denied liability and have asserted affirmative defenses and facially reasonable explanations in response to Lead Plaintiff's allegations.

(b) At every opportunity the Defendants asserted that Lead Plaintiff could not establish Defendants' scienter regarding Project Alpha because the fraud was carried out by non-defendant "rogue" employees. This issue was central to Lead Plaintiff's ability to establish the Company's liability. And, given the limited amount of time set aside for trial and the need to focus the evidence on Defendants' (potentially) even more serious issues of lack of loss causation and damages, there was a risk that a jury would not find for the class on liability.

(c) The prosecution of this Litigation through trial would necessarily involve complex issues resulting in conflicting expert testimony, especially on damages, materiality and loss causation, the outcome of which is by no means certain. Hence, there would be a risk that the Lead

Plaintiff might fail to convince the trier of fact to find in its favor and that Defendants would be able to obtain a judgment in their favor.[9]

   (d)  Going to trial and winning big presented risks as well. If the jury came back with a judgment of the magnitude posited by Lead Plaintiff's damage expert, it would likely have led to bankruptcy protection and the Class' claim would be subordinated and therefore worth very little.

   (e)  Even if the Class could eventually recover a larger judgment after trial, given the time value of money, a future recovery in excess of the proposed Settlement may not be more beneficial than receiving the benefits of the proposed Settlement now at this stage of the case. Moreover, any future trial judgment would still be subject to the continuing risks and vicissitudes of litigation, through possible appeals. *See Draney v. Wilson, Morton, Assaf & McElligott*, [1985-1986 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶92,359, at 92,310 (D. Ariz. Sept. 30, 1985) (Compendium, Ex. 5). Even very large judgments, recovered after lengthy litigation and trial, can be completely lost on appeal as a result of judgment notwithstanding the verdict.[10] Thus, counsel believe that were this Litigation tried through to conclusion rather than settled, the risk of obtaining a recovery less than the amount of the proposed Settlement would be great, and the trial itself would be complex and risky.

---

[9] *See In re Nucorp Energy Sec. Litig.*, 661 F. Supp. 1403, 1414 (S.D. Cal. 1987) (even after some defendants settled for $41 million, a six-month jury trial that focused on an accounting fraud claim resulted in a verdict for the non-settling defendants). *See also Meyer v. Citizens & S. Nat'l Bank*, 677 F. Supp. 1196, 1207-08 (M.D. Ga. 1988).

[10] *See, e.g., Robbins v. Koger Props.*, 116 F.3d 1441 (11th Cir. 1997) (reversing and rendering judgment in favor of defendants in connection with an $81 million securities class action verdict in favor of plaintiffs); *Piper v. Chris-Craft Indus.*, 430 U.S. 1, 97 S. Ct. 926 (1977) (reversing the Second Circuit's $25,793,365 damage award under the Williams Act after eight years of litigation); *Hughes Tool Co. v. Trans World Airlines, Inc.*, 409 U.S. 363, 93 S. Ct. 647 (1973) (reversing treble damage judgment for over $145,000,000 – action commenced in 1961); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979).

3.    **The Stage of the Proceedings at Which Settlement Was**
      **Achieved and the Amount of Discovery Completed**

Both the knowledge of Lead Plaintiff's counsel and the proceedings themselves have reached

a stage where an intelligent evaluation of the Litigation and the propriety of the Settlement can be

made. As set forth in the Howes Declaration, Lead Counsel conducted an exceptionally thorough

investigation of the facts during the course of the Litigation. Lead Plaintiff's counsel reviewed and

analyzed over one million two hundred thousand pages of documents, interviewed potential

witnesses, consulted with experts, took or defended nineteen depositions, and basically prepared the

case for trial. The extensive motion to dismiss and summary judgment briefing also attuned Lead

Plaintiff to the legal and factual issues that were in dispute and the risks of continued litigation.

Thus, the parties reached an agreement to settle at a point when they had a "full understanding of the

legal and factual issues surrounding [the] case." *Manchaca v. Chater*, 927 F. Supp. 962, 967 (E.D.

Tex. 1996). Nothing more is required. Even if the formal discovery had not been as advanced as it

was here, the Court could still approve this settlement. Indeed, courts have held that a great amount

of formal discovery is not a "necessary ticket to the bargaining table." *In re Corrugated Container

Antitrust Litig.*, 643 F.2d 195, 211 (5th Cir. 1981) (citing *Cotton*, 559 F.2d at 1332). *See also Newby

v. Enron Corp.*, 394 F.3d 296, 306 (5th Cir. 2004) ("The overriding theme of our caselaw is that

formal discovery is not necessary as long as (1) the interests of the class are not prejudiced by the

settlement negotiations and (2) there are substantial factual bases on which to premise settlement.").

In fact, given the PSLRA-mandated discovery stay during the pendency of motions to dismiss, there

is rarely any formal discovery in a PSLRA case prior to a decision on a motion to dismiss.

Nevertheless, here, in order to plead a complaint designed to withstand a motion to dismiss under the

PSLRA, Lead Counsel expended an exceptional amount of resources on the investigation and

informal discovery. It was this investigation which significantly aided Lead Plaintiff in obtaining the

information it needed to adequately plead a case against the Defendants.

The comprehensive investigative and formal discovery efforts initiated by Lead Counsel in this case provided Lead Plaintiff not only with a clear picture of the strengths of its own case, but also of the legal and factual defenses that Defendants would raise at trial. Having completed a multi-year effort to prepare the case for trial, which allowed them to properly evaluate the case, Lead Counsel have succeeded in obtaining an outstanding settlement without undertaking an expensive trial. Lead Plaintiff is also satisfied that the Settlement here was reached after appropriate investigation, research and trial preparation to enable it and its counsel to knowledgeably settle the case.

### 4. The Probability of Success on the Merits

As in every complex case of this kind, Lead Plaintiff faced formidable obstacles to recovery at trial, both with respect to liability and damages. The claims asserted in this Litigation on behalf of Class Members were based on §§11 and 15 of the Securities Act of 1933, and §§10(b) and 20(a) of the Securities Exchange Act of 1934, as well as Rule 10b-5 promulgated thereunder. While Lead Counsel are confident that they could prove their claims, there is nevertheless a great degree of risk present and there were no guarantees that Lead Plaintiff would ultimately prevail.

For example, in order to succeed on the §10(b) claim, Lead Plaintiffs would have the substantial burden of proving, *inter alia*, that Defendants' statements and/or omissions were false and materially so, that the omissions or misstatements impacted the market price of Dynegy securities and were the cause of the alleged damage to the Class, and that, most importantly here, Defendants acted with scienter. *See Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*, 365 F.3d 353, 361 (5th Cir. 2004).

To satisfy the burden of proving scienter, Lead Plaintiffs would have to prove that Defendants either knew of the alleged improprieties surrounding Project Alpha or were reckless in not causing them to be disclosed. Lead Plaintiff recognizes that the proof of scienter is always

- 13 -

difficult and complex, as it involves the exploration of the state of mind of individuals concerning what they knew about this transaction and the Company's operations and finances at particular points in time – knowledge that could, and probably would, vary among the individual defendants. Lead Plaintiff believes that it could establish that the Defendants violated the securities laws and did so with the requisite intent to deceive, or at least with a reckless disregard for the truth. However, in this regard, the *Olis* criminal trial was of no help.

In this regard, any suggestion that this case was without risk, as a result of the Government's successful criminal prosecution of former Dynegy employee Jamie Olis, would be wide of the mark. While some of the exhibits and testimony received during the *Olis* trial were useful in putting this case together, several very significant pieces of the evidentiary puzzle did not come out in the *Olis* trial, and some that did would not have been available to Lead Plaintiff in the event this case had gone to trial. As a result, Lead Plaintiff had to build its own case brick by brick; we could not have prevailed simply by attempting to replicate the Government's criminal case. Thus, while the *Olis* trial undeniably was helpful, significant hurdles and risks remained to be overcome by Lead Plaintiff.

One of the most significant hurdles to be overcome was the task of linking real-time knowledge of the Alpha-related accounting fraud to Dynegy's former CFO, Rob Doty, in order to prove corporate scienter.[11] Because the Company's state of mind was not directly at issue in the *Olis*

---

[11]     The Court, in its Memorandum and Order on Defendants' motions to dismiss, appeared to conclude that a liability finding against Dynegy on plaintiffs' 1934 Act claim would require proof that Doty, in particular, had actual awareness of the problematic details of Project Alpha. While Lead plaintiff believes that evidence gathered during discovery would also have supported a corporate scienter finding based on the knowledge of former controller Mike Mott and/or based on the roles of Jamie Olis and other members of the Alpha "deal team" in Dynegy's financial reporting, we focused a great deal of energy and resources on proving the fact and timing of Doty's knowledge of alpha.

trial, little evidence was offered on this point at that trial. Indeed, the only such evidence was Gene

Foster's testimony that Doty was fully aware of Project Alpha and was told that information was

being withheld from Arthur Andersen. But, Foster's testimony, in all likelihood, would not have

been available for use in the trial of this case.[12] As a result, we were required to put together the

corporate scienter case essentially from scratch. In summary, we were able to stitch together

evidence, not offered at the *Olis* trial, showing that CFO Doty was personally aware of the hedging

activities, forbidden by and concealed from Andersen, which ultimately caused the failure of the

Project Alpha structure.[13] Our success in piecing together a compelling corporate scienter case is

evident from Dynegy's decision not to seek summary judgment on the issue. But, putting this case

together was no easy matter, as ultimately it rested on a handful of documents – some hand-written –

culled from the 1,200,000 pages produced during discovery in the case.

Nor did the *Olis* trial focus on class-wide damages or causation, or on the defenses with

respect to these issues. Here again, we prepared to try these contentious issues without any

substantial benefit from the *Olis* case.[14]

Lead Plaintiff's §11 claims faced their own risks. For example, if a jury found, as

Defendants argued, that Dynegy's stock price declined, among other reasons, because of the

---

[12]     During discovery, it became clear that Mr. Foster intended to refuse, on 5th Amendment grounds, to testify in this case. Thus, there was a significant likelihood that his prior testimony in the *Olis* trial would have been excluded because it did not meet the requirements of Rule 804(b)(1) of the Federal Rules of Evidence.

[13]     We would be pleased to discuss this aspect of the case in detail, showing how we developed the evidence on the scienter issue, but any such presentation would necessarily be *in camera*, since the relevant evidence is substantially all marked "Confidential" under the terms of the Protective Order entered earlier by the Court.

[14]     In fact, as the Court is aware, the Defendants in this case attempted to use the testimony provided in the *Olis* trial by former Regents employee Jeffrey Heil to discredit the causation and damage case herein. Thus in this sense, the *Olis* trial was more hindrance than help in preparing this case for trial.

industry-wide decline experienced in the energy sector, the Class could have recovered far less than the amounts Lead Plaintiff might have claimed were the maximum provable damages.

Another risk was that some defendants could satisfy their "due diligence" defense to the §11 claims. Although this defense would have been a bit more difficult to assert for several Dynegy executives, the possibility that the Company's outside directors and Lehman could sustain such a defense was significant.

Therefore, although Lead Plaintiff believes its claims are strong, and Lead Plaintiff is confident as to the likelihood of their success, establishing liability at trial would by no means be guaranteed. Defendants raised credible defenses and plausible responses to Lead Plaintiff's allegations. Any or all of these responses could have been accepted by the ultimate fact finder, which could have resulted in the Class recovering significantly less than the amount of the Settlement or nothing at all.

These risks to establishing liability were real and made any settlement or judgment in excess of the Settlement obtained here highly uncertain. Therefore, the Settlement is in the best interests of Class Members and should be approved.

In short, both sides have developed factual and legal support for their respective positions. It is difficult to predict which view would prevail at trial, but Lead Plaintiff recognizes that there is always a real risk that, despite its best efforts, it would be unsuccessful. This outstanding Settlement eliminates the risk and provides a substantial recovery for the Class.

> **5.    The Range of Possible Recovery and Difficulty of Proving Damages**
>
> **a.    The Risk of Establishing Damages**

Even if Lead Plaintiff were successful in establishing liability at trial, it would face substantial risks in proving damages. Lead Plaintiff has avoided this profound uncertainty by entering into this Settlement.

The traditional measure of damages for a defrauded investor under §10(b) is the difference between the price paid for the securities and the "fair value" of the investment in the absence of fraud at the time of the purchase, the difference being the artificial inflation caused by the defendants' misstatements and/or omissions. *See In re Letterman Bros. Energy Sec. Litig.*, 799 F.2d 967, 972 (5th Cir. 1986). The determination of fair value is a technical and complex procedure involving the analysis of many factors, including corporate asset value, cash flow, income, and growth prospects for the future, industry and economic trends, the quality of management, and the nature and amount of liabilities. It is likely that substantial disagreement among experts would exist at trial as to the "fair value" of the stock at each point in time during the Class Period. While Lead Plaintiff's damage expert opined that damages were in the billions, his report was severely criticized by Defendants' damage expert who opined that recoverable damages, if any, are in the $30 plus million range. Lead Plaintiff might have difficulty successfully parsing out for the jury the portion of investor losses that were caused by Defendants' alleged fraud and the portion of losses attributable to other causes. *See Dura Pharms., Inc. v. Broudo*, ___ U.S. ___, 125 S. Ct. 1627, 1633 (2005). If the decline in the price of the Dynegy stock is plotted against other comparable energy companies' stock prices for the same time, it could be argued that significant portions of the decline in Dynegy securities was not indicative of fraud but was instead completely market-related. Moreover, the end of the Class Period in this action came on the heels of the Enron debacle, and the energy industry as a whole was under intense scrutiny by consumers, regulators and the equity markets. Defendants could be expected to argue that Dynegy was being painted with the same broad brush as Enron and that the markets overreacted to its announcements, fearing another Enron-sized disaster.

In sum, the determination of damages is a complicated and uncertain process involving conflicting expert testimony. Expert testimony could rest on many subjective assumptions, any of

which could be rejected by a jury as speculative or unreliable. In their respective trial reports, the damage assessments of Lead Plaintiff's and Defendants' experts varied substantially, and in the end, this crucial element at trial would therefore be reduced to a "battle of the experts." The reaction of a jury to such expert testimony is highly unpredictable and in such a battle, Lead Counsel recognize the possibility that a jury could be swayed by convincing experts for the Defendants, and find that there were no damages or only a fraction of the amount of damages that Lead Plaintiff contended were suffered.

In light of the above, Lead Counsel were cognizant of the fact that, had the case proceeded to trial, it may have been very difficult to recover all or even most of the losses sustained. Consequently, Lead Plaintiff's counsel believe that the Settlement of $474,050,000 plus interest and The Regent's involvement in the replacement of two directors of Dynegy represents an exceptional result for the Class.

> **b.** **The Settlement Consisting of $474,050,000 Plus Interest and the Implementation of the Corporate Governance Reform Falls Well Within the Range of Reasonableness**

Courts agree that determination of a "reasonable" settlement is not susceptible to a single mathematical equation yielding a particularized sum. Rather, as Judge Friendly explained, "in any case there is a range of reasonableness with respect to a settlement." *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972); *Fickinger v. C.I. Planning Corp.*, 646 F. Supp. 622, 630 (E.D. Pa. 1986); *accord Zerkle v. Cleveland-Cliffs Iron Co.*, 52 F.R.D. 151, 159 (S.D.N.Y. 1971). Courts recognize that "there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery." *Detroit v. Grinnell Corp.*, 495 F.2d 448, 455 n.2 (2d Cir. 1974). *See also Parker*, 667 F.2d at 1210 n.6; *McNary*, 76 F.R.D. at 650. Similarly, as the court in *Karasik v. Pacific Eastern Corp.*, 180 A. 604 (Del. Ch. 1935):

> [T]he amount claimed is one hundred million dollars and the amount received in settlement is a minimum of three hundred and eighty-five thousand dollars. Now

- 18 -

that is a wide disparity. . . . [I]t is one thing to obtain a judgment, and quite another thing to collect it. Figures, however imposing, should not compel practical considerations to yield place to visions.

*Id.* at 609 (Compendium, Ex. 13). And, as Judge Wyatt observed in *West Virginia v. Chas. Pfizer & Co.*, 314 F. Supp. 710, 743-44 (S.D.N.Y. 1970), "[i]t is known from past experience that no matter how confident one may be of the outcome of litigation, such confidence is often misplaced," *aff'd*, 440 F.2d 1079 (2d Cir. 1971).

In light of the substantial risks of establishing both liability and damages, Lead Plaintiffs believe that the Settlement of $474,050,000 plus interest, and the implementation of a director selection process, which Lead Plaintiff's corporate governance expert Robert A.G. Monks opines was a factor in a 37% increase in Dynegy's market capitalization after the announcement of the Settlement, constitutes a substantial recovery, falls within the range of reasonableness and is unquestionably better than other possible alternatives – little or no recovery. While it is certainly possible that the maximum recoverable damages at trial would exceed the amount of the Settlement, that assumes acceptance of Lead Plaintiff's liability and damage evidence by the jury. Given the obstacles and uncertainties of continued litigation, Lead Plaintiff and its counsel submit that the Settlement represents an exceptional recovery.

### 6. The Opinion of Lead Plaintiff's Counsel and Class Members Favor Approval of the Settlement

As indicated above, "'a presumption of correctness is said to attach to a class settlement reached in arms length negotiations between experienced, capable counsel after meaningful discovery.'" *Lelsz*, 783 F. Supp. at 297 (citation omitted). Here, experienced and highly capable Lead Counsel, after extensive pretrial preparation and exhaustive arm's-length negotiations, have concluded that the Settlement is a very good result and in the best interest of the Class. This conclusion was reached after Lead Counsel acquired a thorough understanding of the case through an extensive, independent investigation, the proceedings in the Litigation, and the settlement

- 19 -

negotiation process, which themselves took months. The view of Lead Plaintiff's counsel, while not conclusive, "is entitled to significant weight." *See Fisher Bros. v. Cambridge-Lee Indus., Inc.*, 630 F. Supp. 482, 488 (E.D. Pa. 1985); *Ahearn v. Fibreboard Corp.*, 162 F.R.D. 505, 528 (E.D. Tex. 1995).

Moreover, the support from the Members of the Class is significant. In response to the Notices mailed to over 80,000 Class Members, no objections to the Settlement have been submitted by Class Members, and the date for serving and filing objections has expired. Such overwhelming support by the Class argues strongly in favor of the Settlement. *Maher*, 714 F.2d at 456 n.35; *Grinnell Corp.*, 495 F.2d at 463. Finally, the Lead Plaintiff was involved in all aspects of the Litigation and it was consulted extensively concerning issues surrounding settlement and the substantial risks, expense and uncertainties in taking this case to trial. The Lead Plaintiff appointed by the Court is a very sophisticated investor, a multi-billion dollar fund with a significant financial stake in the Litigation. Moreover, The Regents were appointed Lead Plaintiff in the Enron securities case and are thus very knowledgeable regarding similar issues present here. The Regents participated directly in the negotiations and/or made themselves available to review, discuss and reject/approve settlement offers communicated by Lead Counsel. The Lead Plaintiff approves of the Settlement and agrees that it is in the best interest of the Class. *See* Declaration of James E. Holst of the University of California Regents in Support of Lead Plaintiff's Motion for Final Approval of Settlement and Award of Attorneys' Fees and Expenses, submitted herewith.

## V. THE COURT SHOULD FIND THE SHARE COMPONENT OF THE SETTLEMENT EXEMPT FROM REGISTRATION

The settlement consideration in this case includes 17,578,581 shares of Dynegy Class A common stock. The Stipulation of Settlement contemplates that this stock would be exempt from the requirement that the Company issue a registration statement, under §3(a)(10) of the Securities Act. That section exempts from the 1933 Act's registration requirement

- 20 -

[a]ny security which is issued in exchange for one or more bona bide . . . claims . . . or partly in such exchange and partly for cash, where the terms and conditions of such issuance and exchange are approved, after a hearing upon the fairness of such terms and conditions at which all persons to whom it is proposed to issue securities in such exchange shall have the right to appear, by any court . . .

15 U.S.C. §77c.

As the SEC has observed, "section 3(a)(10) is usually applied in cases involving settlement of class action lawsuits." *SEC v. Navin*, 166 F.R.D. 435, 438 (N.D. Cal. 1995), *aff'd*, 1996 U.S. App. LEXIS 25424 (9th Cir. Sept. 25, 1996). "[H]istorically, this exemption from registration has been utilized by companies [like Dynegy] that have previously registered the issuance of securities with the Commission and that have complied with the reporting provisions of the Securities Exchange Act of 1934." *Id.*[15]

In this type of case, compliance with the requirements of Rule 23(e) also satisfies the requirements for invoking the §3(a)(10) exemption. Notice to the class of all of those who will receive the securities, along with the opportunity to appear at the hearing, satisfies the procedural requirements of §3(a)(10). A determination by the Court that the settlement is fair, reasonable and adequate under Rule 23(e) satisfies the requirement in §3(a)(10) that the court make a determination that the terms and conditions of the exchange are fair. Thus, courts that have approved settlements involving the issuance of securities have routinely concluded that the §3(a)(10) exemption therefore applies. *See, e.g., In re Cell Pathways, Inc., Sec. Litig.*, No. 01-CV-1189, 2002 U.S. Dist. LEXIS 18359, at *21 (E.D. Pa. Sept. 24, 2002) ("upon final approval of the settlement by the Court, the conditions for exemption under 15 U.S.C. §77c(a)(10) will be met and the securities issued as part of this settlement are exempt from the provisions of 15 U.S.C. §77c") (Compendium, Ex. 7); *Adams v. Amplidyne, Inc.*, No. 99-4468(MLC), 2001 U.S. Dist. LEXIS 14464, at *7 (D.N.J. Aug. 15, 2001)

---

[15]    Dynegy's current SEC filings are posted on the Company's website at www.Dynegy.com.

(approving settlement under Rule 23(e) and holding that "the Settlement Shares are therefore unrestricted and freely tradeable exempted securities pursuant to Section 3(a)(10) of the Securities Act of 1933") (Compendium, Ex. 1).

## VI.     THE PLANS OF ALLOCATION ARE FAIR AND REASONABLE

Assessment of a plan of allocation of settlement proceeds in a class action under Rule 23 of the Federal Rules of Civil Procedure is governed by the same standards of review applicable to the settlement as a whole – the plan must be fair, reasonable and adequate. *See In re Ikon Office Solutions, Inc.*, 194 F.R.D. 166, 184 (E.D. Pa. 2000); *Class Plaintiffs v. Seattle*, 955 F.2d 1268, 1284 (9th Cir. 1992), *Chicken Antitrust*, 669 F.2d at 238 (standard of review "applies with as much force to the review of the allocation agreement as it does to the review of the overall settlement between plaintiffs and defendants"). District courts enjoy "broad supervisory powers over the administration of class-action settlements to allocate the proceeds among the claiming class members . . . equitably." *Beecher v. Able*, 575 F.2d 1010, 1016 (2d Cir. 1978); *accord Chicken Antitrust*, 669 F.2d at 238. An allocation formula need only have a reasonable, rational basis, particularly if recommended by "experienced and competent" class counsel. *White v. NFL*, 822 F. Supp. 1389, 1420 (D. Minn. 1993); *In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 142 F.R.D. 588, 596 (S.D.N.Y. 1992).

The objective of a plan of allocation is to provide an equitable basis upon which to distribute the settlement fund among eligible class members. Here, the Plans of Allocation[16] were developed by Lead Counsel with the assistance of their damage experts and reflect an assessment of the

---

[16]     One plan of allocation is set forth in the notice relating to the Arthur Andersen settlement which encompasses only common stock claims relating to the December 2001 secondary offering. The notice relating to the settlement with the remaining defendants sets forth a plan of allocation for all of the securities covered by that settlement.

- 22 -

damages that could have been recovered, as well as an assessment of the individual Class Members' damages, based on when they bought and sold their Dynegy securities and will result in a fair distribution of the available proceeds among those Class Members who submit valid claims. "A reasonable plan may consider the relative strength and values of different categories of claims." *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 462 (S.D.N.Y. 2004).

The decisions cited above recognize that the goal of an equitable plan is fairness to the class, taking into account the strength of claims based on available facts and evidence. The Plans of Allocation in this case are based on such principles and fall within the mainstream of allocation plans routinely approved. The Plans of Allocation are fair and equitable methods of allocating the proceeds of this Settlement among Class Members. Thus, Lead Counsel respectfully request that the Court approve the Plans of Allocation.

## VII.   CONCLUSION

The settlement for $474,050,000 plus interest and corporate governance reform is an outstanding result, given the serious risks inherent in further litigation and the complexity and expense involved in taking this case to trial. Accordingly, Lead Plaintiff respectfully submits that the proposed Settlement is fair, reasonable, and adequate, and should be approved by the Court in all respects. Moreover, the Plans of Allocation of settlement proceeds are fair, reasonable and adequate and should be approved by the Court.

DATED: June 30, 2005                    Respectfully submitted,

                                        SCHWARTZ, JUNELL, GREENBERG
                                          & OATHOUT, LLP
                                        ROGER B. GREENBERG
                                        Federal I.D. No. 3932
                                        Texas Bar No. 08390000


                                        _____
                                              ROGER B. GREENBERG

Two Houston Center
909 Fannin, Suite 2000
Houston, TX 77010
Telephone: 713/752-0017
713/752-0327 (fax)

PROVOST & UMPHREY LAW FIRM, LLP
WALTER UMPHREY
JOE KENDALL
Texas Bar No. 11260700
3232 McKinney Avenue, Suite 700
Dallas, TX 75204
Telephone: 214/744-3000
214/744-3015 (fax)

**Co-Liaison Counsel**

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
WILLIAM S. LERACH
  Attorney-in-Charge
KEITH F. PARK
DARREN J. ROBBINS
HELEN J. HODGES
BYRON S. GEORGIOU
JAMES I. JACONETTE
MICHELLE M. CICCARELLI
JAMES R. HAIL
ANNE L. BOX
JOHN A. LOWTHER
ALEXANDRA S. BERNAY
MATTHEW P. SIBEN
ROBERT R. HENSSLER, JR.
ANDREA N. SALOW
401 B Street, Suite 1600
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
G. PAUL HOWES
JERRILYN HARDAWAY
Federal I.D. No. 30964
Texas Bar No. 00788770
1111 Bagby, Suite 4850
Houston, TX 77002
Telephone: 713/571-0911

- 24 -

LERACH COUGHLIN STOIA GELLER
    RUDMAN & ROBBINS LLP
REGINA M. AMES
KATHERINE C. SPLAN
9601 Wilshire Blvd., Suite 510
Los Angeles, CA 90210
Telephone: 310/859-3100
310/278-2148 (fax)

**Lead Counsel for Plaintiffs**

THE BASKIN LAW FIRM
JAMES D. BASKIN
Federal I.D. No. 27093
Texas Bar No. 01872050
300 W. 6th Street, Suite 1950
Austin, TX 78701
Telephone: 512/381-6300
512/322-9280 (fax)

**Additional Counsel for Lead Plaintiff**

S:\Settlement\Dynegy.Set\BRF SETTLEMENT 00022081.doc

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing LEAD PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF FINAL APPROVAL OF SETTLEMENT AND PLANS OF ALLOCATION OF SETTLEMENT PROCEEDS document has been served by sending a copy via electronic mail to www.dynseclit.com on June 30, 2005 pursuant to the Court's service orders.

_____
MO MALONEY